IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| VICKY J. HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-0747-CV-W-ODS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AND OPINION AFFIRMING**
**COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability benefits .  The Commissioner's decision is affirmed.


I.  BACKGROUND


Plaintiff was born in February 1952 and has completed high school.  The parties agree Plaintiff's insured status expired on December 31, 1999, so to be eligible for benefits she had to be disabled on or before that date.

Plaintiff has been extremely overweight throughout the relevant time period, and this condition has contributed to most of her ailments.  Since 1994, Plaintiff has been diagnosed as obese and advised to lose weight; between 1994 and the end of 1999 Plaintiff's weight ranged between 259 and 316 pounds.

Plaintiff testified that her knee "gave out" while walking up some stairs in July 1997, R. at 204, but she did not seek medical treatment until April 1998.  At that time, she told her doctor (Dr. Mary Calhoun) that she hurt the left knee walking a few weeks prior and represented that she had no problems "for years until now."  R. at 127.  In response to a later question, Dr. Calhoun confirmed this was the first time she had

addressed Plaintiff's knee problems. R. at 134. Dr. Calhoun arranged for an x-ray and an MRI, which revealed a torn meniscus. R. at 135. Plaintiff was then referred to an orthopedist who first prescribed conservative treatment. By June 1998 the symptoms were "more or less controlled" and while the doctor felt surgery was not called for left the decision to Plaintiff. She opted for arthroscopic surgery, which was performed in July 1998. Following surgery, Plaintiff was to commence exercises. R. at 119. Plaintiff "overdid" her activities in August and caused a setback, and in September the doctor noted degenerative disease "which is not surprising given her weight." R. at 118. He prescribed medication, a brace, and exercises, and further warned that some degree of pain would probably be present unless the knee was replaced. On October 19, 1998, the orthopedic surgeon wrote "[f]or the last few days, she has been asymptomatic. She is happy. She is not even wearing the brace. I encouraged her to get this, because she has arthritis in the knee which will not go away. It may become symptomatic later." R. at 188. No further appointments were planned absent a change in Plaintiff's condition.

Plaintiff did not seek medical attention for her knee again until she saw Dr. Gregory Hummel in June 2002, at which time she reported pain and discomfort in both knees. Dr. Hummel noted Plaintiff weighed 370 pounds and that no treatment would succeed unless Plaintiff lost 125 to 130 pounds. He administered a steroid injection and prescribed medication; these interim treatments proved successful. R. at 150. Plaintiff returned weekly for injections through the middle of September 2002 and reported significant improvement. R. at 147-49. On May 2, 2003, Dr. Hummel wrote a letter indicating Plaintiff was a candidate for gastric bypass surgery, R. at 146, but for reasons that are not clear Plaintiff has not had the surgery. R. at 224-25.

The record contains additional medical reports regarding Plaintiff's condition, but they fall into two categories: (1) records from well before Plaintiff's onset date (and, often, at a time when Plaintiff was working) and (2) records from well beyond Dr. Hummel's (which, it should be noted, reflect visits more than a year after Plaintiff's insured status expired). These records are not relevant to establishing Plaintiff's medical

2

condition in the time between her alleged onset date and the expiration of her insured status.

During the hearing Plaintiff was asked to describe her condition as it existed prior to December 31, 1999. She testified that she could hardly walk due to a combination of knee pain and asthma, both of which were exacerbated by her weight. She estimated that she could walk half a block, stand for thirty minutes, lift 20 to 25 pounds occasionally and lift five pounds frequently. She had been using a cane for five to six years, and when she went grocery shopping she utilized an electric scooter the store supplied for its customers. Her daily activities consisted of getting up at approximately 7:00 a.m. so she could watch her grandson. She cooked, did the laundry, and cleaned the house, although her ability to perform these tasks were hampered in various ways by her knee problems. For instance, she did the dishes sitting down, had her husband carry the laundry up and down the stairs, and required rest breaks in the midst of cleaning. She is able to drive, visits friends, and participates in a parent/teacher organization. She spends much of her day sitting or reclining in a chair.

A vocational expert ("VE") testified that Plaintiff's prior work as a real estate agent was skilled light work but Plaintiff's inability to type left her with no skills that could be transferred to sedentary work. When asked to assume a hypothetical claimant of Plaintiff's age, education and work experience who could stand and walk two hours in a day, lift ten pounds occasionally and five pounds frequently, sit for six to eight hours a day, carry objects for only short distances, and had to avoid excessive dust, fumes and chemicals, the VE testified such a person could perform a variety of sedentary jobs. Examples of such jobs included telephone solicitor and cashier. Upon further questioning from Plaintiff's representative, the VE testified the person in the hypothetical could not perform their past relevant work.

The ALJ found Plaintiff did not meet the listed impairment identified by Plaintiff's representative because there was no evidence Plaintiff could not ambulate effectively as required by the listing. The ALJ also found Plaintiff retained the residual functional capacity identified in her hypothetical question to the VE. In reaching this conclusion, the

3

ALJ discounted Plaintiff's credibility for a variety of reasons, including the nature and effectiveness of medical treatment within the relevant time period and her daily activities.[1] Based on the VE's testimony, the ALJ concluded Plaintiff retained the residual functional capacity to perform work.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff focuses on the ALJ's determination that Plaintiff did not meet or equal a listed impairment. The ALJ was directed to a listing for musculoskeletal impairments that requires (1) major dysfunction of a joint, characterized by gross anatomical deformity, (2)

_____

[1]Included in the description of Plaintiff's daily activities was an indication that Plaintiff engaged in gardening and swimming. In response to a question about hobbies, Plaintiff testified "I like to swim. Yeah, well, flower gardening." R. at 213. It is not clear that Plaintiff actually swims and gardens or when she engaged in these activities. Of course, if Plaintiff swam and gardened on a regular basis during the relevant time period, this factor is properly considered in evaluating her physical limitations. However, the record's vagueness deprives the Court of confidence in this regard. Nonetheless, even without this factor the record contains sufficient evidence to support the ALJ's decision.

chronic joint pain and stiffness with limitations of motion, and (3) medical findings of joint space narrowing, bony destruction or ankylosis in a weight-bearing joint resulting in an inability to ambulate effectively. 20 C.F.R. Part 404, Sbpt. P, App. 1, § 102A (2004). The ALJ found Plaintiff did not meet this listing because she did not meet the rather restrictive standard for determining whether one can ambulate effectively. See id. § 1.00B(2)(b)(1) & (2). In reaching this conclusion, the ALJ noted that Plaintiff did not utilize a walker, two crutches or two canes as contemplated by the regulations, and her testimony about her abilities was undercut by the record. Plaintiff alleges she was disabled in July 1997 but did not seek medical treatment for nearly a year. Plaintiff reported no problems after completely rehabilitating from the arthroscopic surgery and did not seek medical care for over three and a half years. In the meantime, Plaintiff did not follow her doctors' advice to use a knee brace and lose weight. The record supports the ALJ's conclusion that Plaintiff could ambulate effectively (as defined in the regulations) in the relevant time period.

Plaintiff relies heavily on Social Security Ruling (SSR) 02-1p (issued on September 12, 2002) to argue that she meets the listing because she is obese. Such a finding is not required by SSR 02-1p. This ruling was promulgated after the specific listing for obesity was removed and provides guidance for evaluating claims where the claimant is obese. The ruling explains that changes were made in the existing listings to address obesity; the effect of obesity in musculoskeletal cases is addressed in the listings at Section 1.00Q:

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

5

Ruling 02-1p also specifically discusses the interplay between the listed impairments and obesity:

> Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.

Plaintiff seems to argue that obesity combined with anything that is "almost" a listed impairment is equivalent to a listed impairment. This interpretation is not supported by the regulations or Ruling 02-1p. The combination of impairments – including obesity – must still meet the standards established in the listing. The ALJ properly considered the combined effects of Plaintiff's obesity and joint problems. For the reasons stated earlier, the ALJ's finding that Plaintiff did not satisfy the requirements of a listed impairment is supported by substantial evidence in the record as a whole.

Plaintiff also relies on these arguments to contend that even if Plaintiff did not meet a listed impairment she lacks the residual functional capacity to work. However, for the reasons stated earlier the ALJ's determination about Plaintiff's residual functional capacity during the relevant time period is supported by evidence in the record as a whole.

6

## III. CONCLUSION

For these reasons the Commissioner's final decision denying Title II benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: April 22, 2005                          UNITED STATES DISTRICT COURT